A. C. F. GASOLINE CO., PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 5188.  Promulgated May 13, 1927.

Claim for paid-in surplus, based on an alleged gift of a contract by the stockholders to the corporation, denied, it appearing that the contract was acquired by the corporation from nonstockholders.

*James P. Quigley, Esq.*, for the petitioner.
*Thomas P. Dudley, Jr., Esq.*, for the respondent.

In this proceeding the petitioner seeks a redetermination of its income and profits tax liability for the calendar years 1917 and 1918, for which the Commissioner has determined deficiencies in the sums of $20,846.94 and $20,293.77, respectively.

Two questions are involved. The first is whether the petitioner is entitled to paid-in surplus on account of a casing-head-gas contract

it acquired. The second is whether the petitioner is entitled to deduct from gross income an aliquot part of the value of such contract each year on account of the exhaustion of the supply of casinghead gas.

The pleadings raised another issue involving rates of depreciation on items of plant and equipment. However this issue was withdrawn by the petitioner at the hearing.

The respondent in determining the deficiencies proposed, included in the invested capital of the petitioner an amount of $81,200 as the value of the casing-head-gas contract. This value has been accepted by the petitioner. However, in his answer, the respondent asked to have the deficiencies increased through the exclusion from invested capital of the above amount upon the ground that the acquisition of the contract by the petitioner did not result in paid-in surplus.

### FINDINGS OF FACT.

The petitioner is a corporation organized in 1916 under the laws of the State of Delaware, with its principal office at Tulsa, Okla.

About February 18, 1915, D. W. Franchot, a man experienced in the operation of oil and gas properties and who had made a careful study of the extraction of gasoline from casing-head gas, examined a property known as the " Susie Crow " lease, consisting of 53⅓ acres of land in Oklahoma and described as follows: South half of the south half of the southwest quarter and the west thirteen and one-third acres of the north half of the southwest quarter of section 4, township 18 north, range 7 east of the Indian Base Meridian. At that time there were six producing wells on the property, producing approximately 3,200 barrels of very fine gravity oil. The oil was produced from what was known as the Bartlesville sand, which lay at a depth of 2,600 feet below the surface and had a thickness of from 40 to 80 feet. There was also found to underlie the surface a prolific shallow sand which was called the " latent sand," and also a gas sand called the " Wheeler gas sand." There was also another oil sand called the " Skinner sand " which was known as a producing sand. Franchot also ascertained that the gas, which is referred to as casing-head gas, occupied the sand in which the oil was found and was produced from the wells together and coincident with the oil. In 1915, after this examination, D. W. Franchot, acting as agent for Cosden & Co., the Cushing Gasoline Co., and D. W. Franchot & Co., purchased the lease on this property consisting of a seven-eighths interest in the oil and gas.

Cosden & Co. was a corporation. J. S. Cosden was president and E. P. Perry vice president. The Cushing Gasoline Co. was a corporation. W. L. Curtis was president and F. A. Aiken was vice

president. D. W. Franchot & Co. was a copartnership consisting of N. V. V. Franchot and Douglas W. Franchot, his son.

The ownership of the " Susie Crow " lease was then as follows:

|                         | Per cent. |
|-------------------------|-----------|
| Cushing Gasoline Co.    | 50        |
| Cosden & Co.            | 25        |
| D. W. Franchot & Co.    | 25        |

The lease was operated during the fall and winter of 1915 as an oil and gas property, the gas being used as fuel to produce power to operate the lease. In February, 1916, D. W. Franchot made an exhaustive physical test of the volume and gasoline content of the casing-head gas on this lease and found the gas produced from the lease had a gasoline content of " a strong five gallons per thousand feet of gas." He also estimated that there were " 400,000,000 cubic feet of gas in the sand underlying the Susie Crow lease."

On March 5, 1916, the Franchot Gasoline Co., a corporation, was organized under the laws of the State of Oklahoma with an authorized capital of $30,000, consisting of 300 shares of a par value of $100 a share. No operations were begun and no money was paid in until about August, 1916. About August 1, 1916, the name of the corporation was changed to A. C. F. Gasoline Co. On August 7, 1916, an agreement was entered into between this company and the owners of the Susie Crow lease, Cosden & Co., the Cushing Gasoline Co., and D. W. Franchot & Co., as follows:

MEMORANDUM OF AGREEMENT, made and entered into this 7 day of August, 1916, by and between Cosden & Company, Cushing Gasoline Company, and D. W. Franchot & Company, parties of the first part, and A. C. F. Gasoline Company, a corporation, party of the second part. As to the sale of Casinghead Gas from the following described land, to-wit, and the building of a gasoline manufacturing plant thereon:

The South Half of the South Half of the Southwest Quarter and the West thirteen and one-third (13⅓) acres of the North Half of the Southwest Quarter of the Southwest Quarter, all in Section Four (4), Township Eighteen (18) North, Range Seven (7) East of the Indian Base Meridian, containing fifty-three and one-third (53⅓) acres of land, more or less.

WHEREAS, said first parties are now operating on said lands for oil and gas and certain wells thereon are productive, in addition to oil, of what is termed casing-head gas, and

WHEREAS, second party agrees to build a gasoline manufacturing plant on the above described lease and has agreed to purchase from the first parties all the casing-head gas productive of gasoline in paying quantities, as produced from the wells now on said land, or that may be thereafter, during the term of this contract, drilled thereon;

NOW THEREFORE, for the purpose aforesaid, and in consideration of the rights and privileges granted herein, by first parties to second party and of the payment, covenants and promises by the party of the second part to be made, done, kept and performed, it is hereby agreed as follows:

1st. First parties hereby agree to deliver and sell to the second party and second party agrees to purchase and take at first parties' lease or wells on said lands, the entire production of casing-head gas as produced from the wells now, or that may thereafter be drilled, on said premises and which are productive of casing-head gas in paying quantities; first parties agree to be responsible to the lessor in their lease, for the royalty on the casing-head gas removed from said lands.

2nd. Second party shall pay for said casing-head gas as delivered at said lease on said land at the rate of 5¢ per 1000 cubic feet. Second party shall, on or before the 10th day of each month, render written statements with meter readings to first parties of the casing-head gas transported to its plant from said lease above mentioned during the preceding month, by mailing the same to the office of the parties of the first part, and on or before the 15th day of said month shall make payment for same. Second party shall, at its own expense, furnish, install, and at all times keep in repair a proportional meter, or meters, of standard grade, in first-class order and working condition for the purpose of measuring the casing-head gas transported from said lease through said lines; and first parties shall have at all times the right to inspect and test said meters, and to be present when readings of meters are made. Meters shall be read daily and the gas is to be measured at four to eight ounce pressure.

3rd. First parties hereby lease, and grant unto the second party, insofar as they have the right so to do, sufficient of the surface of this land for the laying of gas lines, buildings, railroad switches, etc., necessary to enclose said machinery, as may be necessary in manufacturing of gasoline and the transportation by it of the gas from the wells of first parties to the gasoline plant owned by the second party and of the return by it of the dry gas to the lines or other point designated by first parties on said land; and the second party, if necessary, agrees to secure the consent of the land owner for the use of sufficient of the surface of said lands, as above mentioned.

4th. Immediately upon the execution of this contract the second party agrees at its own expense to build a gasoline manufacturing plant at the place on said lands designated by first parties; to lay and install the necessary lines of pipe to connect up the wells producing Casinghead Gas of the first parties on said lands with their gasoline plant and for the return of enough dry gas, or all if required, at sufficient pressure for lease operations.

All equipment placed by second party on said leasehold premises shall be and remain the property of second party and at the termination of this contract, it shall have the right to take up and remove the same.

5th. Party of the second part agrees to hold first parties free and discharged from liability or damage resulting from the operations of second party and to assume all responsibility for its own acts or negligence in its business.

6th. First parties shall, at all times, have the right to reserve whatsoever casing-head gas they may actually need for the operation of their wells. It is also understood and agreed that first parties are to exercise their own judgment in the management of their wells and property as relates to the amount of casing-head gas taken from said wells and the manner of such taking, and that if at any time they find it necessary by reason of their operations, second party is to cease taking casing-head gas from any of said wells, or that it is injurious to any of said wells to take the casing-head gas therefrom that nothing herein shall prevent them from stopping the second party from taking gas from such wells.

7th. It is understood and agreed that if at any time during the term of this contract, payments for gas are not made in accordance herewith, or upon the

violation of any of the other terms or conditions of this contract, by the party of the second part, first parties may, without notice, discontinue furnishing gas to second party.

8th. This contract, all of the rights, benefits and privileges shall continue in full force and effect for and during the remainder of the terms of the present existing oil and gas mining lease of first parties. This contract subject to a physical test to be made of the casing-head gas by party of the second part within three weeks from date and accepted by party of the second part.

Stock in the A. C. F. Gasoline Co. was issued as follows:

|                    | Shares |
|--------------------|--------|
| W. L. Curtis       | 50     |
| F. A. Aiken        | 50     |
| J. S. Cosden       | 100    |
| D. W. Franchot     | 50     |
| N. V. V. Franchot  | 50     |
| Total              | 300    |

The petitioner thereupon constructed a plant with all the necessary pipe lines and tanks for the collection and treatment of the gas and the extraction of gasoline therefrom. Near the close of 1916 the petitioner exercised its rights under the contract and began producing gasoline from the casing-head gas, continuing operations during the years 1917 and 1918.

At the time the agreement was made two types of contracts or arrangements for the sale of casing-head gas were in use in this district. One arrangement was similar to what was later called the Indian Schedule. In this schedule the price paid the owner of casing-head gas for each 1,000 cubic feet of gas, was equal to one third of the product of the number of gallons of gasoline per 1,000 cubic feet of gas at the Chicago tank-wagon prices. Another, less common, arrangement called the fifty-fifty contract, was for the owner of the casing-head gas to receive one half of the sales price of the gasoline extracted from its casing-head gas. At the time the agreement was made the prevailing Chicago tank-wagon price for gasoline was 20 cents a gallon. The value of the casing-head gas contract on the date of its acquisition by the corporation was $81,200.

### OPINION.

GREEN: The petitioner claims that it is entitled to paid-in surplus on account of the casing-head gas contract on the theory that the contract, or at least the value in excess of the prescribed royalty rate, was a gift from the stockholders to the petitioner.

The evidence shows that the Susie Crow lease was owned by two corporations and a partnership, the Cushing Gasoline Co., Cosden & Co., and D. W. Franchot & Co. These three organizations were parties of the first part in the agreement, and the A. C. F. Gasoline

Co. was party of the second part. No bonus or cash payment was stipulated as a consideration in the agreement. The only consideration was the royalty rate of 5 cents a thousand cubic feet of casing-head gas. No stock was issued to the parties of the first part and none of the parties of the first part became stockholders of the petitioner corporation.

The owners of the lease were as follows:

|                              | Per cent. |
|------------------------------|-----------|
| Cushing Gasoline Co          | 50        |
| Cosden & Co                  | 25        |
| D. W. Franchot & Co          | 25        |

The stockholders of the petitioner were as follows:

|                                                        | Shares. |
|--------------------------------------------------------|---------|
| W. L. Curtis, president, Cushing Gasoline Co           | 50      |
| F. A. Aiken, vice president, Cushing Gasoline Co       | 50      |
| J. S. Cosden, president, Cosden & Co                   | 100     |
| D. W. Franchot, partner of D. W. Franchot & Co         | 50      |
| N. V. V. Franchot, partner of D. W. Franchot & Co      | 50      |

Nothing has been introduced in evidence to prove that the individuals who held stock in the petitioner were holding such stock for the benefit of the organizations of which they were stockholders. In the absence of such proof to the contrary, it must be assumed that the agreement entered into between the petitioner and the Cushing Gasoline Co., Cosden & Co., and D. W. Franchot & Co., was an arm's-length transaction in which each of the parties endeavored to secure the best terms possible.

There is a provision in the agreement which reads as follows:

First parties shall, at all times, have the right to reserve whatsoever casing-head gas they may actually need for the operation of their wells. It is also understood and agreed that first parties are to exercise their own judgment in the management of their wells and property as relates to the amount of casing-head gas taken from said wells and the manner of such taking, and that if at any time they find it necessary by reason of their operations, second party is to cease taking casing-head gas from any of said wells, or that it is injurious to any of said wells to take the casing-head gas therefrom that nothing herein shall prevent them from stopping the second party from taking gas from such wells.

Pursuant to this paragraph the first party could at any time utilize all of the casing-head gas to operate its wells; it could regulate the amount of gas taken from the wells and the manner of such taking; and it could prevent the taking of gas from the wells by the second party if first party deemed it necessary by reason of its operations.

It seems clear that the petitioner secured a very favorable contract from the three organizations owning the lease, none of which were stockholders in the petitioner corporation. Such a transaction does not give rise to paid-in surplus. The contract was not paid in by the stockholders; it was not a gift from the stockholders. It was

acquired from nonstockholders, and the petitioner is no more entitled to have its value included in invested capital than the value of any other advantageous contract. The Commissioner, as alleged by him in his answer, erred in allowing any amount to be included in invested capital as the value of the contract.

The second issue relates to depletion, or exhaustion, if any, to be allowed the petitioner. To us it appears that this is the ordinary situation of a contract, without bonus, for the payment of royalties, made after March 1, 1913. It is contended that the contract was a gift from the stockholders to the corporation. To this contention the obvious answer is that the stockholders had no interest in the subject matter of the contract. The allowance for depletion or exhaustion is measured by the cost, where property is acquired by purchase, lease, or contract, after March 1, 1913. The petitioners have no cost other than the royalty payments and are entitled to deduct only such payments. The petitioner is entitled to no deduction by reason of the depletion or exhaustion of the value of the contract.

> *Judgment will be entered after 15 days'*
> *notice, under Rule 50.*